**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

AMY L. HURLBUT,

        Plaintiff,

                                     **Case No. 2:18-cv-402**
    v.                               **JUDGE JAMES L. GRAHAM**
                                     **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Amy L. Hurlbut, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 20), and the administrative record (ECF No. 9). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.    BACKGROUND

In April 2014, Plaintiff filed applications for both supplemental security income and disability insurance benefits, alleging that she had been disabled since March 30, 2014. (R. at 249–64.) Plaintiff's application was denied initially and upon reconsideration. (R. at 152–78.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 179–80.)

Administrative Law Judge Carrie Kerber ("ALJ") held a hearing on February 21, 2017, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 48–90.) On March 30, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 25–40.) On February 23, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7.) Plaintiff then timely commenced the instant action.

## II.     HEARING TESTIMONY[1]

### A.     Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she was thirty-six years old on the date of the administrative hearing and that she was approximately five feet, one inch tall, and weighed approximately 185 pounds. (R. at 55.) Plaintiff lives with her mother and step-father. (R. at 56.) Plaintiff has her driver's license and drives to get groceries "or go to the food place. The Job and Family Services or the Social Security." (*Id*.) Plaintiff receives Medicaid assistance. (R. at 56–57.)

Plaintiff received a college degree as a Certified Nursing Assistant and was certified in Missouri and North Carolina where she worked as a nursing assistant. (R. at 57, 60–62.) Before she became certified, she worked as a home health aide. (R. at 61–62.) Plaintiff also attended school to become a physical therapy assistant but did not finish that degree. (R. at 57.) Plaintiff worked at Walmart as a stock clerk and a deli worker. (R. at 58–60.)

Plaintiff testified about her typical day and explained that she has difficulty getting out of bed sometimes. (R. at 64–65.)[2]

---

[1] The Undersigned limits the analysis of the evidence and the administrative decision to the issues raised in the Statement of Errors.

[2] This testimony is discussed in detail in the analysis.

Plaintiff testified that her biggest problems are her fatigue and constant pain. (R. at 69.) Although she has pain everywhere, her pain is located mostly in her upper body. (*Id.*) At the time of the hearing, Plaintiff was taking Paxil for anxiety, panic attacks, and headaches, and taking ibuprofen for headaches. (R. at 70.) She stopped taking other medications because they made her heart race and made her shake. (*Id.*)

Plaintiff sometimes attends religious services, attending approximately once a month. (R. at 72.) She cannot go to the morning services because of problems of getting out of bed. (*Id.*) Plaintiff testified that she spends the entire day in bed approximately four times a month. (R. at 72–73.)

Plaintiff is able to sweep with a broom and dust pan with a long handle for approximately twenty minutes. (R. at 66.) Plaintiff prepares meals in the microwave for herself and does her own grocery shopping. (*Id.*) When she is at the grocery store, most of the times she walks but she will use a motorized chair if she has to walk more than thirty minutes. (R. at 66–67.) Plaintiff does her own laundry but does not carry the laundry basket down to the basement where the front-loading laundry machine is located. (R. at 67–68.) Plaintiff is able to sit and fold laundry. (R. at 69.) Plaintiff used to help with yard maintenance by picking up sticks, mowing, weeding, cleaning gutters, but has not done that since her symptoms flared up around 2014. (R. at 68.)

Plaintiff reads magazines and books for entertainment but many times has to re-read what she has read. (R. at 73–74.) She testified that she has the same problem watching television or movies and will space out and not know what is going on in the show. (R. at 74.) The previous year, Plaintiff went with her mother who drove to North Carolina. (R. at 74–75.) She was there for about a week and "pretty much just chilled there." (R. at 75.) She did not have the energy to

go shopping and keep up with everyone. (*Id.*) Plaintiff testified that when she returns from vacation she crashes and indicated that "I've had to learn not to push it all the time because I'll end up in a bed and I get out." (*Id.*)

Plaintiff goes to sleep around 2:00 or 3:00 in the morning and get up around 11:00 a.m. or 12:00 p.m. (R. at 76.) She naps between two and six hours a day depending on how tired her body is. (*Id.*) Plaintiff testified that she sometimes falls and is not sure if that is a result of a combination of fatigue and being dizzy. (R. at 79.) Plaintiff further testified that she never had fatigue before getting multiple sclerosis. (R. at 80.)

## B.     Vocational Expert Testimony

Joseph Thompson testified as a vocational expert ("VE") at the February 21, 2017, administrative hearing. (R. at 84–89.) The VE testified that Plaintiff's past relevant work included a nursing assistant (very heavy as performed), deli worker, home health aide, and stock clerk, which is heavy as performed and semi-skilled position. (R. at 86.)

The ALJ proposed a series of hypothetical questions regarding a hypothetical individual with Plaintiff's age, education, and vocational background. (R. at 86–89.) The VE testified that such an individual with the residual functional capacity ("RFC") the ALJ ultimately assessed for (except with the ability to perform a full range of work at the light exertional level) could not perform Plaintiff's past employment due to exertion and skill level. (R. at 86–87.) Such an individual with a sit/stand capability could, however, perform 140,000 light, unskilled jobs in the national economy, including the representative jobs of production inspector, packer, and assembler. (R. at 87.) The individual could also perform over 50,000 sedentary, unskilled jobs in the national economy, including representative jobs of bench worker, bonder, and assembler. (*Id.*) The VE testified that those jobs would not be available at either the light or sedentary

exertional level if the individual was to be absent from work four days per month.  (R. at 87–88.)
The VE further testified that the tolerance for being off task would be twenty percent, which
would include scheduled breaks in the morning and afternoon, a thirty-minute lunch, and
additional unscheduled breaks of one to two times per eight-hour shift.  (R. at 88.)

### III.    MEDICAL RECORDS

Douglas Woo, M.D., a neurologist, began treating Plaintiff on March 12, 2015.  (R. at
652–59.)  Plaintiff presented with complaints of multiple sclerosis, complaining of fatigue,
weight gain, falling asleep during the day, frequent nocturia, sleep disruption from pain,
difficulty with bright lights, impaired night vision, dry mouth, shortness of breath, productive
cough, presyncope, chronic constipation, pain in joints, depression, and headaches.  (R. at 653–
54.)  Upon examination, Dr. Woo noted no distress but multiple focal areas of pain to palpation
over bilateral neck consistent with myofascial trigger points.  (R. at 655.)  Noted impressions by
Dr. Woo included multiple sclerosis, myalgias due to myofascial trigger points and osteoarthritis
in neck/skull base, and fatigue and memory loss.  (R. at 656.)  Dr. Woo recommended that she
continue with her Tysabri infusions for her multiple sclerosis.  (*Id.*)

On May 21, 2015, Plaintiff declined a Tysabri infusion, reporting that she had decided to
discontinue her infusions.  (R. at 647–48.)  Upon her request, Dr. Woo spoke with Plaintiff and
discontinuation paperwork was completed for Dr. Woo's signature.  (R. at 648.)

On January 24, 2016, Plaintiff presented to Dr. Woo for a check-up for her multiple
sclerosis, reporting complaints of fatigue and pain in the back, neck, and shoulders.  (R. at 664.)
Since her last visit in March 2015, Plaintiff denied any symptoms of breakthrough clinical
relapse or significant progressive neurologic decline.  (R. at 665.)  Dr. Woo noted that Plaintiff
was not on any disease-modifying therapy for multiple sclerosis.  (*Id.*)  Plaintiff reported

increased fatigue with the cold weather. (R. at 666.) Upon examination, Dr. Woo noted multiple focal areas of pain to palpation over bilateral neck base consistent with myofascial trigger points but normal sensation, movement, strength, and gait and her multiple sclerosis was currently clinically stable. (R. at 668–70.) Dr. Woo also assessed that Plaintiff had immediate recall, working memory, and long-term memory intact. (R. at 668.) Dr. Woo noted that Plaintiff's multiple sclerosis was currently clinically stable. (R. at 670.) Dr. Woo opined that her fatigue was likely multifactorial from a combination of multiple sclerosis, pain from myalgias, sleep disruption from pain, vitamin D deficiency, and mood disorder and that he would continue to monitor it. (*Id*.) He would defer starting any disease-modifying therapy for now because she was not currently interested in being on anything. (*Id*.) Dr. Woo noted that he would schedule a MRI of the brain. (*Id*.)

Upon examination on July 11, 2016, Dr. Woo again noted multiple focal areas of pain to palpation over bilateral neck and left upper back consistent with myofascial trigger points but normal sensation, movement, strength, and gait. (R. at 773–75.) Dr. Woo continued to defer starting any disease modifying therapy for Plaintiff's multiple sclerosis. (R. at 775.)

On July 18, 2016, Dr. Woo completed a Mental Impairment Questionnaire. (R. at 782–84.) Dr. Woo recorded diagnoses of attention deficit disorder / memory loss and multiple sclerosis. (R. at 782.) Dr. Woo opined that Plaintiff would be absent from work more than four days per month. (*id*.) Dr. Woo assessed marked limitation in her ability to perform six work activities. (R. at 783–84.) Dr. Woo assessed only moderate limitations in her ability to understanding, remember, and carry out very short and simple instructions and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*.) While he assessed Plaintiff with marked limitation/difficulty in maintaining concentration, persistence, or

pace, Dr. Wood determined that Plaintiff had no limitations in activities of daily living or in maintaining social functioning.  (R. at 784.)

Plaintiff presented to Dr. Woo on December 7, 2016, with complaints of multiple sclerosis.  (R. at 808–15.)  Upon examination, Dr. Woo noted multiple focal areas of pain to palpation over bilateral neck base consistent with myofascial trigger points but normal sensation, movement, strength, and gait.  (R. at 811–13.)  Dr. Woo noted that Plaintiff's language was fluent with intact repetition and comprehension and that her immediate recall, working memory, and long-term memory were intact.  (R. at 812.)  Dr. Woo performed a trigger point injection in connection to myalgia/myofascial pain.  (R. at 813.)  Dr. Woo noted that he would send for a repeat brain MRI and would defer starting Plaintiff on a disease-modifying therapy for her multiple sclerosis until the results are known.  (R. at 814.)

On December 19, 2016, Dr. Woo complete a Multiple Sclerosis Residual Functional Capacity questionnaire.  (R. at 801–06.)  Dr. Woo identified several symptoms, including fatigue, balance problems, poor coordination, weakness, unstable walking, spasticity, bladder problems, pain, difficulty remembering, depression, emotional ability, difficulty solving problems, problems with judgment, and shaking tremor and/or speech/communication difficulties.  (R. at 801.)  Dr. Woo noted that Plaintiff did not have disorganization of motor function with sustained disturbance of gross and dexterous movement or of gait and station and did not have significant reproducible fatigue or motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination.  (R. at 802.)  Dr. Woo noted that Plaintiff complained of a type of fatigue best described as lassitude rather than a fatigue of motor function and this kind of fatigue is typical of patients with multiple sclerosis.  (*Id.*)  Dr. Woo opined that Plaintiff's experience of pain, fatigue, or other symptoms would constantly interfere

with her attention and concentration and that she was incapable of even "low stress" jobs. (R. at 803.) According to Dr. Woo, Plaintiff could walk one to two city blocks without rest; sit for thirty minutes at a time for a total of less than two hours; stand for thirty minutes at a time for a total of less than two hours. (R. at 803–04.) Dr. Woo reported that Plaintiff needed a job that permits unscheduled breaks lasting five to ten minutes every thirty to sixty minutes and permits shifting positions at will from sitting, standing, or walking. (R. at 804.) Dr. Woo reported that Plaintiff's legs should not be elevated with prolonged sitting. (*Id.*) Dr. Woo opined that Plaintiff could lift and carry ten pounds occasionally; could reach ten percent of the workday and perform fine and gross manipulation twenty percent of the workday; could stoop and crouch ten percent of the workday; and must avoid all exposure to noise, fumes, odors, dusts, gases, poor ventilation, and hazards. (R. at 805–06.) Dr. Woo further opined that Plaintiff's impairments would likely produce "good days" and "bad days" and that she was likely to be absent from work more than four times a month. (R. at 806.)

## IV.    ADMINISTRATIVE DECISION

On March 30, 2017, the ALJ issued her decision. (R. at 25–40.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2019. (R. at 27.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?
    2.     Does the claimant suffer from one or more severe impairments?
    3.     Do the claimant's severe impairments, alone or in combination, meet or
         equal the criteria of an impairment set forth in the Commissioner's Listing of
         Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.     Considering the claimant's residual functional capacity, can the claimant

engaged in substantially gainful activity since her alleged onset date of March 30, 2014.  (*Id.*)

At step two, the ALJ concluded that Plaintiff had the severe impairments of multiple sclerosis, obesity, depressive disorder, and post-traumatic stress disorder ("PTSD").  (R. at 28.)

The ALJ next concluded that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 28.)

At step four of the sequential process, the ALJ assessed Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds.  Additionally, the claimant can have only occasional exposure to extreme heat or cold, humidity, vibration, and workplace hazards such as dangerous moving machinery and unprotected heights.  She is limited to simple, routine tasks that are not fast-paced and should have no strict production quotas.  Furthermore, the claimant's work should be repetitive from day to day with few and expected changes.  Finally, the claimant is limited to only occasional interaction with co-workers, supervisors, and the public with no conflict resolution, persuading others, or tandem tasks.

(R. at 30.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in the national economy that she can perform. (R. at 38–39.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 40.)

---

           perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

# V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

# VI.    ANALYSIS

Plaintiff advances one contention of error.  Plaintiff asserts that the ALJ erred in weighing the treating source opinion of Dr. Woo.  (ECF No. 14 at 9–16.)  Specifically, Plaintiff contends that the ALJ did not provide good reasons for the weight assigned to the opinion and failed to fairly consider the various factors outlined in 20 C.F.R. § 404.1527(c).  (*Id*.)  For the reasons that follow, the Undersigned finds Plaintiff's challenges to the ALJ's consideration and weighing of Dr. Woo's opinions to be without merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2).  "An ALJ is required to give controlling weight to 'a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) 'if the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2))

(alterations in original); *see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (explaining the "treating physician rule").

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ considered Dr. Woo's opinions and assigned them "some weight," reasoning as follows:

> Douglas Woo, M.D., a treating provider since March 2015, completed a multiple sclerosis Questionnaire in December 2016 and noted symptoms including fatigue, balance problems, poor coordination, weakness, unstable walking, and problems with judgment and remembering (Exhibit 29F/2-3). He noted that the claimant did not have disorganization of motor function with sustained disturbance of gross and dexterous movement or of gait and station and did not have significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination (Exhibit 29F/3). However, he suggested that the claimant's pain, fatigue, and other symptoms would constantly interfere with her attention and concentration and she was incapable of even low stress jobs (Exhibit 29F/4). Dr. Woo indicated that the claimant could walk 1 to 2 blocks without rest; sit for 30 minutes at a time for a total of less than 2 hours; stand for 30 minutes at a time for a total of less than 2 hours; and needed an option to sit, stand, or walk at will (Exhibit 29F/4-5). He further stated that the claimant could lift and carry less than 10 pounds occasionally; could reach 10 percent of the workday and perform fine and gross manipulation 20 percent of the workday, each; could stoop and crouch 10 percent of the workday; and needed to avoid exposure to hazards (Exhibit 29F/6-7). Finally, Dr. Woo suggested that the claimant required unscheduled breaks every 30 to 60 minutes for 5 to 10 minutes and would be absent from work more than 4 times per month (Exhibit 29F/5, 7). Dr. Woo is a treating provider, but his limitations are not consistent with his examination findings, including an examination in December 2016 showing normal sensation, movement,

strength, and gait (Exhibits 19F; 21F; 26F; 30F/6-7). His limitations are also not consistent with the claimant's testimony, such as her statement that she could sit for hours at a time. Therefore, Dr. Woo's physical limitations are given only some weight.

(R. at 35–36.)

As set forth above, Plaintiff argues that the ALJ did not provide good reasons for the weight assigned to Dr. Woo's opinion and that the ALJ failed to fairly consider the various factors outlined in 20 C.F.R. § 404.1527(c). (ECF No. 14 at 9–16.) The Court addresses each argument in turn.

## A.     "Good reasons"

Plaintiff argues that the ALJ's proffered reasons for giving reduced weight to Dr. Woo's opinion, namely, that Dr. Woo's assessed limitations were inconsistent with his own examination findings and with Plaintiff's hearing testimony, were not good reasons. (*Id*. at 11–15.)

### 1.     Normal examination findings

Plaintiff contends that the ALJ erred by relying on normal examination findings because her primary symptom of her multiple sclerosis is a debilitating fatigue known as lassitude that has no connection to normal findings of sensation, movement, strength, and gait. (*Id*. at 12–13.) Plaintiff therefore argues that normal findings in these areas "are irrelevant to the central issue in this case, which is the degree to which [she] is limited by her fatigue." (*Id*. at 13.)

"[M]ultiple sclerosis is a progressive disease for which there is no cure" and "[t]he disease is subject to periods of remission and exacerbation." *Jones v. Sec'y of Health and Human Servs*., No. 93-1958, 1994 WL 468033, at *3 (6th Cir. Aug. 29, 1994) (citations omitted); *accord Tuohy v. Sec'y of Health and Human Servs*., 1994 WL 454880, at *1 (6th Cir. 1994) ("The disease [multiple sclerosis] is characterized by periods of exacerbation, in which the victim experiences acute aggravation of her symptoms, and periods of remission, in which the

victim may be able to function almost normally."); *Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981) ("Multiple sclerosis is an incurable, progressive disease subject to [ ] periods of remission and exacerbation."). "Nevertheless, in this circuit, multiple sclerosis is not per se disabling under the social security regulations." *Jones*, 1994 WL 468033, at *3 (collecting cases); *see also Headrick v. Sec'y of Health & Human Servs.*, No. 87-1939, 1988 WL 120897, at *2 (6th Cir. Nov. 14, 1988) ("In this case there is abundant objective medical evidence of the claimant's multiple sclerosis. What is lacking, however, is medical evidence confirming the severity of her fatigue or demonstrating that her multiple sclerosis had reached a stage where it was reasonably likely to produce a degree of fatigue that could fairly be said to be disabling."); *Mannis v. Colvin*, No. 3:12-cv-619, 2014 WL 652931, at *7 (E.D. Tenn. Feb. 20, 2014) ("Although the Plaintiff's September 2009 MRI suggests the possibility of multiple sclerosis, a diagnosis alone 'says nothing about the severity of the condition.'") (citation omitted).

"In evaluating multiple sclerosis, or any other episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). Accordingly, "when a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission from the disease to determine whether the claimant has the ability to engage in substantial gainful employment." *Jones*, 1994 WL 468033, at *3; *see also Wilcox*, 917 F.2d at 278 (finding that "Wilcox should not be penalized because he had the courage and determination to continue working despite his disabling condition" and that the "Secretary erroneously relied on Wilcox's activities during the periods of remission as evidence of his substantial gainful employment"); *Myland v. Astrue*, No. 1:08-cv-63, 2009 WL 5216067, at *12 (W.D. Mich. Dec. 29, 2009) (noting that "the lesson of *Parish* and *Wilcox* 'is that multiple

sclerosis is a disease that requires a longitudinal evaluation' and that the ALJ erred because 'the period focused upon by the ALJ was a period of remission'") (citations omitted).

Here, the ALJ thoroughly discussed Plaintiff's treatment records addressing her multiple sclerosis and fatigue, implicitly considering any exacerbations, the length of the remissions, and the evidence of any permanent disabilities over her years of treatment. (R. at 32–33, 35–38.) The ALJ considered Plaintiff's treatment in early 2014 through December 2016, detailing those visits, examination findings, and test results. (*Id*.) In doing so and concluding that Plaintiff was not disabled, the ALJ relied on normal examination findings throughout these years. (*Id*.) Specifically, while Plaintiff complained of pain and fatigue, examinations over the years, including up until a few months before the ALJ rendered her decision, revealed normal sensation, movement, strength, gait, reflexes, range of motion, motor skills, and coordination. (R. at 402, 440, 451, 462, 472, 503, 519, 526, 580, 600, 605, 609, 651, 656, 668–70, 773–75, 787, 812–13.) While Plaintiff argues that these normal findings are not a "good reason" for assigning less weight to Dr. Woo's opinion (ECF No. 14 at 13), the ALJ did not err in giving less weight to his opinion when considering these findings. *Cf.* 20 C.F.R. § 404.1527(c)(3)-(4) (requiring medical opinions be evaluated for supportability and consistency); *James B. C. v. Comm'r of Soc. Sec'y*, 2019 WL 1199834, at *5 n.4 (S.D. Ill. Mar. 14, 2019) ("That plaintiff suffered from fatigue as a common symptom of MS, however, tells nothing about how the symptom is debilitating for the plaintiff, or how it affects his ability to maintain competitive employment with sedentary limitations."); *Sparing v. Soc. Sec. Admin.*, No. 2:12-cv-1572, 2014 WL 2527117, at *8, 10–11 (D. Nevada June 5, 2014) (finding that the ALJ appropriately rejected treating physician's opinion where that opinion was not supported by objective evidence, including, *inter alia*, normal motor strength); *Wood v. Astrue*, No. 2:10-cv-132, 2011 WL

3510987, at * (E.D. Tenn. July 26, 2011) (affirming denial of benefits where, *inter alia*, "[m]ore tellingly, his [treating physician's] treatment notes indicate normal muscle tone and strength, normal ranges of motion, and normal deep tendon reflexes. . . . These examinations were in 2007 and 2008, the last being only 3 months before the ALJ rendered his decision"), *adopted by* 2011 WL 3511042 (E.D. Tenn. Aug. 10, 2011); *Simmons v. Astrue*, 736 F. Supp. 2d 391, 402 (D. N.H. 2010) (affirming denial of benefits where, *inter alia*, "[i]n the physical evaluations conducted by Simmons' treating physicians she has consistently exhibited normal energy level, awareness, strength, muscle tone, reflexes, gait, etc."). The ALJ's decision to give less weight to Dr. Woo's opinion because of, *inter alia*, normal examination findings enjoys substantial support in the record. *Id.*; *see also* 20 C.F.R. § 416.927(c)(2); *Jones*, 1994 WL 468033, at *3; *Wilcox*, 917 F.2d at 277; *Headrick*, 1988 WL 120897, at *2.

### 2.    Plaintiff's testimony

Plaintiff next contends that the ALJ did not fairly summarize her hearing testimony regarding her ability to sit. (ECF No. 14 at 13–15.) At the hearing, Plaintiff testified as follows about a typical day:

> A  I wake up and it's hard to get out of the bed. Sometimes I crawl out of bed. A lot of times I do. Until I get a  I probably have a cup of coffee. I sit. I watch some TV. I'm very fatigued, as soon as I'm up. I'm very  I'm very – I'm in a lot of pain. Once I -- not matter -- if I'm awake, I'm in pain. If I'm awake, I'm fatigued. So I try to wake up. It takes me, typically two or three hours, literally to try to focus on things. And then once I'm up, I try to get something little done. If I can get the energy to get up and do -- I don't know, make a you know, make a thing of coffee. That's work for me or if I -- if I want to sweep the floor, which I have, I do. That's work for me. Once I'm done, just something that small, I'm ready to sit down again. I'm ready to collapse. My legs –
>
> Q Now, when you say    I'm sorry. Go ahead.
>
> A My legs typically feel like Jell-O and like something is grabbing a hold of them and trying to hold me down. And I typically drag my feet and I get slack for that from people who don't understand and they'll say, why are you dragging your feet

all the time, and I'll say, I don't even notice that I'm doing it. It's just because I'm that fatigued. My body -- I drag it everywhere, you know. You got to do what you got to do and life is very different for me now, than it used to be. I fight every day. Every day, I fight, so that I'm not in that bed all the time. Because if I didn't fight that's where I'd be and –

(R. at 64–65.)

Plaintiff also testified as follows about how the position in which she spends the majority of her day:

Q What position do you spend the majority of your day in? Are you sitting? Lying down?

A With my legs up.

Q In a recliner?

A I wish I had one. No. Just the couch. Couch.

Q Sitting on the couch with your legs up?

A Yeah. I'm very fidgety because of the pain. It's hard for me to become comfortable anywhere I sit. Littlest thing or things can make me hurt worse. I have to have –

Q How can you normally sit at one time?

A Well, I sit a lot. Several hours, but –
Q You can sit for hours at one time?

A But I'm typically moving all the -- you know, a lot because of the pain. And I have to switch my legs up and down, up and down. My legs are always –

Q Okay.

A -- hurting.

(R. at 65.)

Plaintiff contends that the ALJ, when explaining why she gave less weight to Dr. Woo's opinion, takes Plaintiff's statements out of context and unfairly characterizes them as a "statement that she could sit for hours at a time." (ECF No. 14 at 14 (citing R. at 36).)

Plaintiff's assertion is not well taken. While the ALJ did note as Plaintiff contends that she could sit for hours at a time (*see* R. at 36), the ALJ also acknowledged Plaintiff's fidgeting and movement. (R. at 31.) Notably, the ALJ specifically considered the entirety of Plaintiff's testimony in this regard, noting that Plaintiff "can sit for a long time, but is fidgety due to pain and adjusts her positions." (*Id*.) Accordingly, the ALJ fairly considered Plaintiff's testimony regarding her ability to sit and the ALJ did not err when relying on this testimony in deciding to assign less weight to Dr. Woo's opinion.

**B.      Factors outlined in 20 C.F.R. § 404.1527(c)**

Finally, Plaintiff contends that the ALJ did not properly weigh the factors under 20 C.F.R. § 404.1527(c). (ECF No. 14 at 15–16.) As noted above, if an ALJ does not give a treating source's opinion controlling weight, the ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c); *Friend v. Comm'r of Soc. Sec*., 375 F. App'x 543, 550 (6th Cir. 2010) (explaining that the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight") (internal quotation omitted).

Here, as discussed above, the ALJ thoroughly discussed Plaintiff's treatment records with Dr. Woo as well as questionnaires completed by Dr. Woo. (R. at 32–33, 35–38.) In doing so, the ALJ implicitly considered the length of the treatment relationship and the frequency of examination, the nature and extent of Plaintiff's treatment relationship with Dr. Woo,

supportability of Dr. Woo's opinion, consistency of his opinion with the record as a whole, and Dr. Woo's specialization. (*Id.*) As previously discussed, the ALJ nevertheless assigned less weight to Dr. Woo's opinion because his limitations were inconsistent with Plaintiff's normal findings and her hearing testimony. For these reasons, the ALJ properly applied the relevant *Wilson* factors and her decision enjoys substantial support in the record.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g., Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: July 9, 2019                          *s/ Elizabeth A. Preston Deavers*
                                            ELIZABETH A. PRESTON DEAVERS
                                            CHIEF UNITED STATES MAGISTRATE JUDGE